UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 10-80038-CIV-MARRA/JOHNSON

PAUL GAUGUIN CRUISES, INC,. a/k/a
PGC, Inc. a Delaware corporation,

Plaintiff,

vs.

eCONTACT, INC., a Florida corporation, and
STEVE HABER,

Defendants.
_____/

**OPINION AND ORDER**

This cause is before the Court upon Defendants eContact, Inc. and Steve Haber's Motion for Summary Judgment (DE 26) and Plaintiff Paul Gauguin Cruises, Inc.'s Motion for Summary Judgment (DE 30). The Court held oral argument on the motions on February 4, 2011. The Court has carefully considered the motions and the arguments of counsel and is otherwise fully advised in the premises.

I.  Background

The facts, as culled from affidavits, exhibits, depositions, answers, answers to interrogatories and reasonably inferred therefrom, for the purpose of these motions, are as follows:

Defendant eContact, Inc. ("eContact") provides business development and marketing services primarily in the travel industry. (Steve Haber Dep. at 6-7, DE 27-1.) Defendant Steve Haber ("Haber") is the President and co-owner of eContact, a company he co-founded in 2001. (Haber Dep. at 6-7.)  His wife, Betsy Flynn, is a director and co-owner of eContact and

eContact's designated corporate representative. (Elizabeth Flynn Dep. at 3, 5-6, DE 25.) With respect to their co-ownership of eContact, Haber is responsible for sales and clients while Flynn handles operations and administration. (Haber Dep. at 36.) The owner and president of Plaintiff Paul Gauguin Cruises, Inc. ("PGC") is Harry "Hank" Lewis ("Lewis"). PGC is comprised of a single vessel, the Paul Gauguin. (Lewis Dep. at 7-8, DE 24-1.) The Paul Gauguin is a cruise ship that cruises Tahiti, the French Polynesia and the South Pacific Ocean.

Lewis and Haber began discussing the terms of a potential contract somewhere between December 2008 and March 2009. They had approximately six different meetings in connection with the potential contract. (Lewis Dep. at 15-17, 33-34.) Lewis told Haber that it was his intention to sell or charter the ship, but if he could not do so, he would need eContact's services to help book 2010 cruises aboard his ship. (Lewis Aff. ¶ 3, DE 31-1.) According to Lewis, Haber understood that he was in the process of selling or chartering the ship (Lewis Dep. at 41) whereas Haber stated that while he knew Lewis wanted to sell the ship, Lewis told him it was not happening any time soon (Haber Dep. at 102-03; Haber Aff. ¶ 4, DE 35-3). Haber suggested putting language into the contract stating that PGC would pay eContact $250,000 if PGC sold the ship or if PGC were to terminate the agreement, but Lewis rejected this provision. (Haber Dep. at 103-06, 170.)

On or about June 10, 2009, PGC and eContact entered into a contract wherein eContract was to provide marketing services, inside sales and a reservation team to PGC. (Contract, Ex. A, DE 29-1.) Lewis negotiated the terms of the contract and personally signed the contract on behalf of PGC. (Lewis Dep. at 21-22; Contract.) The terms of the contract required PGC to advance to eContract three installments of $100,000.00 against commissions starting on June 1,

2009 and ending on August 1, 2009.  The contract provided that "[a]dvance will be netted from eContact commissions, and eContact will continue until advance is net zero or return a check back to PG Cruises for any advance amount which have not netted to zero (e.g., if the arrangement is terminated by either party)."  Additionally, the terms of the contract stated that "[e]ither party must provide the other sixty days notice of termination."  (Ex. C to Contract.)  Lastly, the contract contained a provision which called for a review of the program "every 3 months to determine continuation." (Contract.)  eContact drafted the contract, negotiated it and understood that the contract contained a 60-day notice of termination clause. (Flynn Dep. at 41-42; 83-85, 92-93.)  eContact had an attorney review the contract before it was signed. (Haber Dep. at 100.)

According to Joseph Kurosz, one of PGC's main contact persons with eContact and Haber, Haber told him that he recommended that PGC draft contract language to "assure that unearned advance money is returned to PGC if the agreement is terminated and  60 days notice is required for termination." (Kurosz Aff. ¶¶ 2-3, DE 31-1.)  Haber disputes that he recommended such language or anything contrary to the terms of the contract. (Haber Aff. ¶ 5.)  According to Lewis, PGC and Lewis relied on Haber's representation that all unearned commissions would be returned to PGC in the event that the contract was cancelled and Lewis would not have entered into the agreement without such assurances. (Lewis Aff. ¶¶ 5-7.)

PGC advanced $200,000 in commission money under the June 10, 2009 contract. eContact used the first two $100,000.00 installments to pay for a variety of expenses associated with the project. (Flynn Dep. at 12, 19-20, 26, 28, 30-31, 33, 37.)  On July 22, 2009, PGC's counsel, Keith Nashawaty, contacted eContact and stated that PGC wanted to terminate the

3

contract and advised eContact that it was in the process of selling substantially all of its assets to a third-party to whom it would introduce eContact. (Lewis Dep. at 32-35; July 22, 2009 letter from Nashawaty to Haber, Ex. F, DE 29-1.) Flynn told Nashawaty that there was a 60-day termination notice in the contract and an additional $100,000.00 payment was due to eContact. (Flynn Dep. at 42-43.) The following day, on July 23, 2009, PGC, via email, provided formal notice to eContact that it was terminating the contract in 60 days and it advised that it would not be advancing the additional $100,000 due under the agreement. (July 23, 2009 email from Nashawaty to Flynn, Ex. E, DE 31-1.) Flynn emailed back, stating that she was confused about the impact of the non-funding of the $100,000 on the parties' agreement. (July 13, 2009 email from Flynn to Nashawaty, Ex. E, DE 31-1.)

In September of 2009, PGC demanded return of the $200,000 and attempted to foster an arrangement to accomplish this. (September 11, 2009 email from Nashawaty to Haber, Ex. M, DE 31-1.) In mid to late September of 2009, PGC's counsel, Nashawaty, came to the Boca Raton, Florida offices of eContact, asking for PGC's $200,000 back. Haber told him that eContact would not be giving back the commission money advanced, but would instead continue to earn against the commissions advanced. (Haber Dep. at 59-63.) On September 24, 2009, PGC's counsel sent Haber an email stating that the agreement between the parties addressed a transition in ownership and the possibility of having to terminate the contract and the return of unearned commissions. (September 24, 2009 email from Nashawaty to Haber, Ex. M, DE 31-1.) Lewis then sent Haber a letter demanding the return of all unearned commissions advanced eContact by PGC, threatening legal action if return was not made. (September 25, 2009 letter from Lewis to Haber, Ex. O, DE 31-1.)

4

During the period in which the contract was in effect, eContact provided no productivity reports to PGC, despite PGC's repeated requests. (Lewis Dep. at 40-41; 83.) On the date PGC provided the notice to terminate the contract, eContact had not earned any commissions. (Flynn Dep. at 45; Haber Dep. at 36-37, 174.) eContact contends it was possible for eContact to have earned some commissions during the 60-day time period after the notice of termination. (Haber Dep. at 87, 125; Flynn Dep. at 45.) Instead of giving back unearned commissions, eContact expected to net the advance to zero. (Flynn Dep. at 80-85; Haber Dep. at 90-91, 115-124.) The non-payment of the final $100,000 did not hinder eContact's ability to perform any obligations or earn commissions under the contract.[1] (Haber Dep. at 127; Flynn Dep. at 43.)

In moving for summary judgment, Haber contends that the economic loss rule bars any recovery for fraud, and Plaintiff has failed to provide any evidence of fraud by Haber. With respect to the breach of contract claim, eContact states that Plaintiff breached the contract by failing to provide the final $100,000 installment payment or provide 60 days notice of their termination of the contract, constituting a breach of contract by PGC. eContact thus contends PGC's breach excused eContact from fulfilling its contractual obligations.

Plaintiff's motion for summary judgment makes the following arguments: (1) eContact breached the contract when it failed to return all unearned commissions when Plaintiff terminated the contract and (2) Haber fraudulently induced Plaintiff to enter into the contact as evidenced by his statements that it was never his intent to return the commission money advanced, but rather eContact was going to continue to earn against the advances no matter how

---

[1] Haber submitted an affidavit stating that Plaintiff's failure to tender the final installment hindered eContact's performance of its obligation under the contract. (Haber Aff. ¶ 13, DE 35-3.) Given the Court's ruling, the Court need not address the inconsistency in Haber's testimony.

long it took.[2]

## II. Summary Judgment Standard

The Court may grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The stringent burden of establishing the absence of a genuine issue of material fact lies with the moving party. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court should not grant summary judgment unless it is clear that a trial is unnecessary, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986), and any doubts in this regard should be resolved against the moving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970).

The movant "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp., 477 U.S. at 323. To discharge this burden, the movant must point out to the Court that there is an absence of evidence to support the nonmoving party's case. Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts and the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronic Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party

---

[2] At oral argument, Plaintiff's counsel stated that Plaintiff was no longer pursuing its unjust enrichment claim. For that reason, the Court will not address the arguments with respect to that claim.

cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) and (B).

Essentially, so long as the non-moving party has had an ample opportunity to conduct discovery, it must come forward with affirmative evidence to support its claim. Anderson, 477 U.S. at 257.  "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990).  If the evidence advanced by the non-moving party "is merely colorable, or is not significantly probative, then summary judgment may be granted."  Anderson, 477 U.S. 242, 249-50.

III.  Discussion[3]

A.  Breach of Contract

The elements for a breach of contract are: (1) the existence of a contract; (2) a breach of the contract and (3) damages resulting from the breach. Friedman v. New York Life Ins. Co., 985 So. 2d 56, 58 (Fla. Dist. Ct. App. 2008); Rollins, Inc. v. Butland, 951 So. 2d 860, 876 (Fla. Dist. Ct. App. 2006). "To constitute a vital or material breach a [party's] nonperformance must be such as to go to the essence of the contract; it must be the type of breach that would discharge the injured party from further contractual duty on his part." Beefy Trail, Inc. v. Beefy King Intern., Inc., 267 So. 2d 853, 857 (Fla. Dist. Ct. App. 1972) citing Corbin on Contracts, Vol. 5, s 1104; see Covelli Family, L.P. v. ABG5, L.L.C., 977 So. 2d 749, 752 (Fla. Dist. Ct. App. 2008) (same); Atlanta Jet v. Liberty Aircraft Svcs., LLC, 866 So. 2d 148, 150 (Fla. Dist. Ct. App. 2004)

---

[3] In a diversity case, the Court applies Florida law. See Pendergast v. Sprint Nextel Corp., 592 F.3d 1119, 1132-33 (11th Cir. 2010); Royal Ins. Co. of America v. Whitaker Contracting Corp., 242 F.3d 1035, 1040 (11th Cir.2001).

(same).  A [party's] failure to perform some minor part of his contractual duty cannot be classified as a material or vital breach.  Beefy Trail, 267 So. 2d at 857.  Whether or not an alleged breach is material is a question of fact.  Covelli, 977 So. 2d at 752; see Beefy Trial, 267 So. 2d at 858 ("whether the plaintiff has presented clear and convincing evidence that the alleged breaches by the defendant are vital or material is a question of fact to be resolved by the trier of fact or jury"); Moore v. Chodorow, 925 So.2d 457, 461 (Fla. Dist. Ct. App.2006) (same).

Here, the contract provides that either party can terminate the contract as long as the 60-day notice is given to the other party. (Ex. C to Contract.)  PGC provided notice of its termination on July 22, 2009 and informed eContact that it would not make the final installment payment of $100,000.  (Lewis Dep. at 32-35; July 22, 2009 letter from Nashawaty to Haber, Ex. F, DE 29-1; July 23, 2009 email from Nashawaty to Flynn, Ex. E, DE 31-1.)  Significantly, there is record evidence that eContact could have earned commissions in the 60-day period following the July 22, 2009 notice of termination.  Indeed, both Haber and Flynn testified that it was possible for eContact to have earned some commissions during that time period. (Haber Dep. at 87, 125; Flynn Dep. at 45.)

Based on this evidence, there is a question of fact as to whether PGC materially breached the contract when it failed to pay the third installment of $100,000.  See Nacoochee Corp. v. Pickett, 948 So. 2d 26, 30 (Fla. Dist.  Ct.  App. 2006) ("A material breach by one party may be considered a discharge of the other party's obligations thereunder"); Troup v. Heacock, 367 So. 2d 691, 692 (Fla. Dist. Ct. App. 1979) (same); see also Fabel v. Masterson, 951 So. 2d 934, 936 (Fla. Dist. Ct. App. 2007) ("It is axiomatic that the anticipatory breach of a contract by one party excuses contractual compliance by the other.")

Should the fact finder conclude that eContact would have earned sufficient commissions during the 60 day period after the notice of termination to warrant receiving the last $100,000.00 installment, the fact finder could conclude that PGC's failure to pay the third installment was a material breach of the contract. On the other hand, if a fact finder concluded that eContact could not have earned back at least $200,000.00 during the 60 day termination period, the fact finder could conclude that PGC's failure to pay the third installment was not a material breach of the contract, and eContact's failure to return any unearned installment payment was a material breach of the contract. Of course, that monetary amount would also be a question for the fact finder to resolve.

PGC, however, claims that eContact was not hindered by PGC's failure to pay the final installment of $100,000, thereby making the breach non-material. Even assuming the record evidence supports such a finding, the Court cannot, at this stage, conclude that the breach was therefore non-material. Given that PGC failed to make the payment first, a fact finder must first resolve the impact of that act. Should the evidence show that eContact would not have earned back any of the commission money, and not paying the final installment of $100,000 did not prevent it from performing the obligations under the contract, there would be no finding that PGC's failure to pay the final installment was a material breach of the contract.

Because there are genuine issues of material fact preventing the Court from deciding which party breached the contract first, summary judgment on the breach of contract claim cannot be granted to either party. Thus, both PGC and eContact's motions for summary judgment on the breach of contract claim are denied.

B. Fraudulent Inducement

Under Florida law, a fraudulent inducement claim requires proof of the following: (1) the representor made a misrepresentation of material fact; (2) the representor knew or should have known of the falsity of the statement; (3) the representor intended that the representation would induce another to rely and act on it; and (4) the plaintiff suffered injury in justifiable reliance thereupon. Biscayne Investment Group, Ltd. v. Guarantee Management Services, Inc., 903 So.2d 251, 255 (Fla. Dist. Ct. App. 2005); Susan Fixel, Inc. v. Rosenthal & Rosenthal, Inc., 842 So.2d 204, 209 (Fla. Dist. Ct. App. 2003); see also Eclipse Medical, Inc. v. American Hydro-Surgical Instruments, Inc., 262 F. Supp. 2d 1334, 1342 n.1 (S.D. Fla.1999).

According to PGC, Haber fraudulently induced it to enter into the contract with eContract by assuring PGC that should either party terminate the contract, any unearned commission money advanced would be refunded. PGC, however, claims that Haber "openly admits that it was never his intent to return the commission money advanced to PGC, but intended to continue to earn against the advances no matter how long it took" and he had "no intention of returning any portion of the additional $100,000 he repeatedly requested from PGC, but would have continued to earn until that advance netted out to zero, even if it took him beyond the termination date to do so." (DE 30 at 7.)

In other words, the essence of PGC's fraudulent inducement claim is that Haber represented and promised PGC that he would abide by the terms of the contract to return unearned commissions advanced by PGC, but at the time the representations and promises were made, he never intended to comply with the contractual terms. The record evidence on which PGC relies to support the claim does not support its contention. All the record evidence

demonstrates that Haber never intended to return the advanced commissions, not because he never intended to comply with the terms of the contract, but rather because he believed and expected that he would eventually have earned the right to retain the advanced commissions pursuant to the terms of the contract.  Even if Haber was mistaken in his interpretation of the contract relative to this ability to continue to generate commissions until the advances were completely earned, this does not demonstrate an intent from the outset to mislead PGC into believing that he would abide by the contract while always intending to disregard its requirements. Hence, PGC cannot make out a claim for fraudulent inducement.

An examination of Haber's deposition testimony, in context, reveals the evidentiary shortfall of PGC's position.  Each time Haber is asked whether he intended to return the commission money to PGC, Haber explains that his intent was always to earn the commission money back.  Relevant portions of the deposition testimony follow:

> Q: But assuming on July 22, you didn't hear back from Keith Nashawaty and you cranked it up and you got this thing to go for the next 60 days, and you guys hit the ground running, how much commission?
> A: That's not what we would have done. **The agreement was to continue, we would continue working until it was netted back to 0**.  So, it had nothing to do with two months we would have earned the commission back.
> Q: It was agreed you'd continue working until it as netted back to 0?
> A: Um-hmm.
> Q: **You never had to give any money back is what you're saying?**
> . . .
> A: I always tell our clients and I told everyone at the very worst we would continue if this project was a complete failure and they hate the Gauguin, which, you know, it's not.
> Q: Okay.
> A. **But we would continue to earn the money**.  We would continue working with travel agents on their behalf until its netted to 0.
> Q: Okay. **So, you never intended to give back any of the 200,000 advance.**
> . . .
> A. **I never thought we would have to give the money back, no. I thought we would be in positive territory.**

Q: Okay.
A: **What we agreed to was to make sure that everyone was whole at the end of the contract.**

(Haber Dep. at 90-91.) (emphasis added.)

Q: Okay. So, **you testified earlier that it was your understanding that you never expected to send any back, that you were gonna net this to 0?**
A: **Right.**
Q: Okay. Well, why would you agree to language in there that says return a check to [PGC] for any advance amounts which have not netted to 0?
A: 'Cause I thought we would be beyond that so we would be way beyond the two hundred. I mean, even after two months we'd be getting into territory we wouldn't owe them any money anyway, so it didn't worry me.
Q: It didn't worry you?
A: And we had the choice all along. **We said we would net this to 0, and Keith wanted say or return a check and we chose the former – the latter. We chose to net this to 0 through earning commissions, which is what every contract we have** . . . .

(Haber Dep. at 116.) (emphasis added.)

Q: But, Mr. Haber, what you're testifying to is that if either party cancelled on 60 days notice or gave you 60-days notice that it was your choice whether to continue to earn beyond 60 days or to give back the check; that's your testimony?
A: That's correct.
Q: You could do either, you could say I'm not giving you back the check, I'm gonna continue beyond 60 days.
A: Yeah, the 60 days was about whether to continue the program We probably should have been more specific, but that was the intent.
Q: **That you were never going to return back any advance commissions?**
A: **No, we would always earn all the money**. We've never not been successful on the project, one; and two, we've never not earned the commission back on a commission deal.
Q: **So, when you signed this contract, is that correct, you never intended to return any of the advance commissions even if the contract was terminated.**
A: **I always intended to earn the commissions through our revenue program**.
Q: Okay.
A: **I always intended that we would make all the money on this**.
Q: But what if you not earned the 200,000 in commissions, you had only earned 140, did you expect to have give back a check for 60, or never?
A: No, you continue until you do. . . .

(Haber Dep. at 117-18.) (emphasis added.)

> Q: **It's real simple, the two hundred grand, you never intended to give it back under any set of circumstances; is that correct**?
> . . .
> A: **No, that's not correct. We would have earned it back doing what we were hired to do.**
> Q: **But if you don't earn it back, you never intended to give it back?**
> . . .
> A. **But we say we continue until we do.**

(Haber Dep. at 119-20.) (emphasis added.)

> Q: Okay. So, if you're understanding is you never expect to have to return any advance commissions, you're gonna earn it, why would you expect Mr. Lewis to give you another $100,000?
> A: Because those were the terms of the agreement.
> Q: The terms of the agreement?
> A: Um-hmm.
> Q: **Okay, you expect him to give you a hundred, but you don't expect to have to give him back any money ever?**
> . . .
> A: **I expect to earn it back through our program that we agreed to.**
> Q: Okay, but aren't the terms of – so, your understanding was you expected to earn the commissions beyond the 60 days from the notice up until the rest of the year?
> A: We expected Mr. Lewis to get his money back through our activities, correct, that was our agreement. Advance and we would earn it back, and so we always expected to have Mr. Lewis made whole, or his company. Not Mr. Lewis, his company.

(Haber Dep. at 123-24.)(emphasis added.)

Thus, although PGC relies on fragments of Haber's deposition testimony to support its claim that Haber never intended to return the commission money advanced by PGC, when read in context, it is clear that Haber simply believed the contract gave him the right to earn back the commissions until the advances were completely earned.  While Haber had a mistaken understanding of the contractual terms, his mistaken understanding does not constitute fraud. At

best, from PGC's standpoint, Haber's statement, as a representative of eContract, might evidence a breach of contract if there was a wrongful failure to return unearned commissions. However, an expressed intention to breach a contract cannot, as a matter of law, constitute fraudulent inducement. See In re Donner's Estate, 364 So. 2d 742, 749 (Fla. Dist. Ct. App. 1978) ("a willful breach of contract alone, without more, is insufficient in law to constitute fraud"). For this reason, PGC's fraudulent inducement claim fails as a matter of law and summary judgment is granted on behalf of Haber.

### III.  Conclusion

Accordingly, it is hereby **ORDERED AND ADJUDGED** that Defendants' Motion for Summary Judgment (DE 26) is **GRANTED IN PART AND DENIED IN PART** and Plaintiff's Motion for Summary Judgment (DE 30) is **DENIED.**

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 1st day of March, 2011.

_____
KENNETH A. MARRA
United States District Judge